John HARRIS, Plaintiff–Appellant,

v.

CITY OF AKRON, et al., Defendants–
Appellees.

No. 93–3056.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1993.

Decided April 6, 1994.

Rehearing Denied April 29, 1994.

Allen C. Carter, Sr. (argued and briefed), Canton, OH, for plaintiff-appellant.

Kathryn W. Pascover (argued and briefed), Director of Law, Akron, OH, for defendant-appellee.

Before: RYAN and SUHRHEINRICH, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior·Circuit Judge.

We must decide in this case whether the owner of real estate that was demolished by city officials is foreclosed from recovering damages in an action under 42 U.S.C. § 1983 because of his failure to plead and prove that no adequate state law remedy existed by which he could pursue his claim. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Vicory v. Walton*, 721 F.2d 1062 (6th Cir.1983), *cert. denied*, 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984). The district court granted summary judgment for the defendants, and we now affirm on different reasoning than that of the district court.

## I.

Because our decision turns on determination of whether the plaintiff carried his burden of demonstrating the existence of a genuine issue of material fact, we recite the facts and prior proceedings in some detail.

## A.

On July 17, 1990, at about 11:30 a.m., the City of Akron Building Inspection Office received a call from Ohio Edison Company, an electric utility, informing it of a potential building hazard at 488 Wooster Avenue in Akron. The defendant John Hymes, chief building inspector, sent defendant Greg Burgoon, Akron's superintendent of building, to the reported location to investigate. Burgoon found a two story brick building that he believed was dangerously close to falling onto Wooster Avenue and a neighboring occupied home. The upper east wall of the building had moved inward four to five feet, and he thought the roof was collapsing.

Burgoon immediately called Hymes, who drove to the Wooster Avenue site to make a personal inspection of the building. After examining the building Hymes determined that an emergency demolition was necessary, as provided by Akron City Code § 190.705:

*Emergency Work*

In case there shall be, in the opinion of the Superintendent of Building Inspection, actual and immediate danger of failure or collapse of a building or structure or any part thereof so as to endanger life or property, he shall cause the necessary work to be done to render the building or structure or part thereof temporarily safe. If the building or structure is in such a state of decay that it is impracticable to be repaired, he may order the building or structure razed or demolished.

The city placed a call to the owner of the building, plaintiff John Harris. Unfortunately, Harris was not at his office; Hymes left an emergency message with Harris' secretary to call the Building Inspection Office immediately. Jim Gardner of the Akron Building Department also contacted Steve Nome, Supervisor of Sanitarians and acquaintance of John Harris, in an attempt to locate Harris. Nome advised Gardner of two alternative addresses where Harris might be found. In fact, Harris was present at one of the two addresses provided by Nome, but no one attempted to contact him at either address.

Instead, Hymes decided that the condition of the building required immediate action, and initiated plans to destroy the building partially. Bids were hastily made, and the emergency demolition began at 4:10 p.m. on July 17, the same day that the damage to the building was reported to the building department. Although Hymes originally planned to remove only the second story of the building, he felt that the entire structure became unstable after a few blows from a wrecking ball and thus he decided to raze the entire building.

The owner, Harris, was using the Wooster Avenue building as a storage warehouse for various materials when it was destroyed. After the demolition, Harris hired an expert in construction and building diagnostics, Jack Bergson, to make an analysis of the building department's decision to destroy the building. Bergson prepared a lengthy affidavit after reading the depositions of Nome, Hymes, Gardner and Burgoon and other documents pertaining to the demolition, viewing photographs in the Akron City Building Department purporting to show the condition of the Harris building before, during and after demolition, and making an on-site inspection of the lot where the building had stood. The plaintiff filed this affidavit in opposition to the defendants' motion for summary judgment.

In his affidavit Bergson stated that the city officials made their decision without ever entering the building or viewing the roof from any point other than ground level. Their hasty decision was made, according to Bergson, based on a "examination of the building [that] did not remotely meet minimum standards for ascertaining structural worthiness."

The affidavit then described in detail readily available techniques by which the true condition of an apparently damaged building can be determined. Examples of methods for learning the actual condition of a roof without risking injury are use of mirrors from a step ladder and use of an elevated bucket called a "cherry picker." With respect to the wall that appeared to have moved, Bergson stated that temporary support by shoring is frequently used while a

more complete inspection takes place. To protect the public during shoring and inspection, the city could have erected a temporary canopy over the sidewalk. Bergson's affidavit stated that the city had the necessary materials available to make this more thorough inspection.

Based on his study of the photographs and documents, Bergson stated in his affidavit that there was no evidence that the roof was collapsing when the demolition order was given. Further, he stated his opinion that the basis upon which Burgoon gave the order for total demolition of the building was flawed. The affidavit disputed Burgoon's basis for finding that the building's reaction to efforts at partial destruction indicated that it was on the verge of a total collapse. Bergson pointed to contradictions in statements of various city officials as to the significance of several facts on which Burgoon relied for his final decision, and gave his opinion of the conclusions properly to have been drawn from the existence of these conditions.

## B.

Harris originally filed a pro se suit, but ultimately hired an attorney who was permitted to file several amended complaints. In the second amended complaint Harris alleged the city deprived him of several constitutional rights by demolishing his building and sought damages under 42 U.S.C. §§ 1983 and 1985 plus attorney fees. Specifically, in his § 1983 claim he alleged that the city and officials named as defendants, acting under color of state law, took his property for a public purpose without paying any compensation, in violation of the Fifth Amendment, and deprived him of his property without due process and denied him equal protection of the laws, in violation of the Fourteenth Amendment. His § 1985 claim charged a conspiracy to deprive him of his property.

The defendants filed a motion to dismiss or, in the alternative, for summary judgment. The district judge referred the matter to a magistrate judge. In his report the magistrate judge recommended dismissing the Fifth Amendment claim as premature and the conspiracy claim for failing to contain required allegations of racial or other class-based discrimination. The magistrate judge recommended that the motion for summary judgment be denied and that the plaintiff be permitted to litigate the due process and equal protection claims.

The district court agreed with the recommendations respecting the Fifth Amendment and conspiracy claims, but concluded that the defendant was entitled to have the due process and equal protection claims dismissed as well. Accordingly, the district court granted summary judgment in favor of the defendants on all claims. The district court found that Harris had failed to satisfy the legal requirements for recovery on either his substantive due process claim or the equal protection claim. With respect to the procedural due process claim, the court found that the plaintiff was seeking recovery for a random and unauthorized act of city officials and that recovery was foreclosed because Harris had failed to plead and demonstrate that no state postdeprivation remedy adequate to compensate his loss existed.

## II.

On appeal the plaintiff does not contest dismissal of the § 1985 conspiracy claim or the equal protection claim. Although he does not contest the dismissal of the Fifth Amendment "taking" claim directly, he does argue that his substantive due process claim incorporated elements of an unlawful taking of his property without just compensation. Nevertheless, on appeal Harris seeks reversal only on the ground that the district court erroneously granted summary judgment on his procedural and substantive due process claims.

## A.

Harris maintains that the district court erroneously treated his action as one for damages suffered because of random and unauthorized acts of city officials. He points out that he has consistently contended that the individual defendants acted under an established procedure of the city. His procedural due process complaint is that the defendants failed to give him notice of their

intent to destroy his building and an opportunity to contest their determination that the building was a nuisance or a threat to public safety or health. According to Harris, the affidavit of his expert raised a genuine issue of material fact as to whether the condition of the building on July 17 was such that the defendants properly proceeded under the emergency provisions of code § 190.705. He contends that the defendants should have proceeded under code § 190.701, which requires that unsafe buildings be removed or repaired and code § 190.702, which provides:

§ 190.702 INSPECTION; NOTICE OF UNSAFE BUILDING; SERVICE, SECURING VACANT STRUCTURE.

(A) The Superintendent of Building Inspection shall examine every building or structure reported as dangerous, unsafe structurally, or constituting a fire hazard; and he shall cause the report to be filed in a docket of unsafe structure, the nature and estimated amount of damages, if any, caused by collapse or failure.

(B) If the person to whom such notice and order is addressed cannot be found within the city after diligent search, then such notice and order shall be sent by certified mail to the last known address of such person. A copy of the notice shall be posted in a conspicuous place on the premises and posting shall be deemed adequate service.

Harris argues that the depositions of Burgoon and other city officials clearly contradict each other on the critical issue of whether an emergency existed. Only a fact-finder, after considering all the evidence, could conclude that Hymes and Burgoon reasonably treated the condition of the building as an emergency requiring demolition without prior notice. And if the demolition were found to have been properly carried out as an emergency under code § 190.705 the plaintiff would be required to seek damages in a postdeprivation state court action. According to Harris, the district court erroneously analyzed the case and granted summary judgment on the procedural due process claim when there was an unresolved issue of material fact. He argues that the district court assumed that an emergency existed, but the essence of the plaintiff's procedural due process argument is that there was no emergency. The plaintiff asserts that the Bergson affidavit put this question squarely in issue.

With respect to his substantive due process claim, Harris argues that the defendants acted arbitrarily and capriciously in destroying his building even though they proceeded under code provisions that are facially fair. He contends that there was no rational basis for the defendants' actions under the circumstances. He also asserts that the Fourteenth Amendment prohibition against deprivation of property by a governmental entity "implicitly contains the same basis on taking [private] property without just compensation as does the more explicit 5th Amendment."

B.

The defendants maintain that the district court properly granted their motion for summary judgment because the plaintiff failed to produce "specific facts" showing the existence of a genuine issue of material fact; evidence "suggesting the possibility" of such an issue is not sufficient to avoid summary judgment. Without discussing the Bergson affidavit, the defendants argue that because they followed the emergency procedure of code § 190.705, in the absence of a constitutional challenge to that procedure, the plaintiff has not stated a procedural due process cause of action, but merely a non-federal claim for tort damages based on negligence.

Departing from the reasoning of the district court, the defendants do not argue that their actions were random and unauthorized. Rather, they contend that the emergency created a situation in which it was impossible to provide prior notice and a hearing before demolishing the building. Under such circumstances, due process does not require a predeprivation hearing if state law provides an adequate postdeprivation remedy. Ohio does provide such a remedy, they assert, by permitting an inverse condemnation action. According to the defendants, the plaintiff's conclusory allegations are not sufficient to create an issue of fact.

As an alternative procedural due process argument, the defendants also assert that the plaintiff's claim is not ripe for review. Because the due process claim grows out of a "taking," they argue that any deprivation is not complete until the plaintiff has sought compensation from the city and failed to obtain it. This is so, they say, because a taking by the governmental unit is not by itself a constitutional violation; it is only when the governmental body takes property and fails to compensate the owner that the taking infringes a constitutional right.

Answering the plaintiff's substantive due process arguments, the defendants state that their actions were not arbitrary or capricious. Indeed, they argue, they carefully followed the procedures prescribed by the city code. The defendants contend that a city may invade individual rights in the interest of public safety, health, morals, or the general welfare so long as its agents do not act arbitrarily or capriciously. Further, the defendants maintain that nothing they did in demolishing the plaintiff's building could reasonably be found to shock the conscience of a reasonable person.

### III.

■ The Due Process Clause of the Fourteenth Amendment does not prohibit every deprivation by the state of an individual's life, liberty or property. Only those deprivations carried out without due process are actionable under 42 U.S.C. § 1983. Generally, the process that is due before the state may deprive an owner of property includes notice to the owner prior to the deprivation and an opportunity for a predeprivation hearing.

### A.

■ We now examine the exception to these general due process requirements that was the basis of the district court's decision to grant summary judgment for the defendants in the present case. In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court explicitly held that in some situations a state may satisfy procedural due process by providing "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." *Id.* at 539, 101 S.Ct. at 1915. When the situation necessitates "quick action" by the state or makes efforts to provide a meaningful predeprivation process impracticable, the persons acting under state authority may proceed without violating the property owner's rights so long as the state provides an adequate postdeprivation procedure. *Id.* Such a procedure satisfies the "fundamental requirement of due process"—an opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 540, 101 S.Ct. at 1915 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)).

*Parratt* involved a tortious destruction of a state prisoner's personal property by the random and unauthorized act of a prison guard, but the rule announced by the Court was not limited to such acts. The touchstone of the *Parratt* rule is the impossibility or impracticability of providing predeprivation process combined with provisions for adequate postdeprivation process.

■ The Supreme Court made it clear in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), that where state actors are following established state procedures that result in the deprivation of an individual's property, ordinarily the existence of postdeprivation remedies is irrelevant. In such cases the general due process requirements of prior notice and opportunity to be heard apply. Nevertheless, even when the defendants are acting pursuant to established procedures, if a predeprivation due process hearing is impossible or impracticable, or the necessity for quick action exists, a postdeprivation remedy may be adequate. *Id.* at 436, 102 S.Ct. at 1158.

In *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court narrowed its *Parratt* holding. The plaintiff in *Zinermon* was admitted to a state mental hospital and confined for a period of time pursuant to Florida's voluntary admission procedures. In his § 1983 action he alleged that hospital doctors and administrators knew or should have known that he

was incompetent to give informed consent to his "voluntary" admission. Thus, he contended, it was a denial of his procedural due process rights for the state not to use the Florida procedure for involuntary placement, which required notice and a hearing before he could be hospitalized for more than the brief time required for an evaluation.

The Court acknowledged that *Parratt* applies when postdeprivation remedies are the only ones that a state could be expected to provide because of the impossibility or impracticability of providing remedies prior to the deprivation. *Zinermon,* 494 U.S. at 128, 110 S.Ct. at 984–85. *Parratt* does not control, however, when the state provides a procedure under which it is predictable that its officials may deprive a person of a protected right. A predeprivation process for Burch, the hospitalized plaintiff, would not have been impossible or impracticable, the Court held, because the state agents could have proceeded under the involuntary commitment provisions of Florida law. The action of the state employees was not "unauthorized" in the *Parratt* sense because the state "delegated to them the power and authority to effect the very deprivation complained of here...." *Id.* at 138, 110 S.Ct. at 990. The deprivation complained of was unauthorized "only in the sense that that it was not an act sanctioned by state law, but, instead was a 'depriv[ation] of constitutional rights ... by an official's abuse of his position.'" *Id.* (quoting *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961)).

### B.

This court has examined and applied *Parratt, Logan,* and *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), (holding that the *Parratt* rule applies to intentional as well as negligent[1] acts) in numerous cases, but we need consider only a few of those decisions here.

In *Watts v. Burkhart,* 854 F.2d 839 (6th Cir.1988), we held that generally where a deprivation is caused by application of established state procedures, the existence of ade-quate postdeprivation procedures is irrelevant. *Id.* at 843. In *Watts* a doctor argued that procedures initiated by a state agency to suspend his license to practice medicine were inadequate and therefore violated due process. The district court dismissed the procedural due process claim under the *Parratt* rule. We reversed, finding that the district court erred in dismissing under *Parratt* when the official actions were taken pursuant to established procedures and there was no showing that quick action by the authorities was essential. *Id.* at 843–44.

In *Doe v. Sullivan County, Tenn.,* 956 F.2d 545 (6th Cir.1992), a state inmate sought damages under § 1983 for injuries received when a cellmate assaulted him. The plaintiff claimed that the jail superintendent and other county officials violated the Eighth Amendment by acting with reckless disregard for his safety, thus depriving him of a protected liberty interest. We found that the district court's jury instructions on procedural due process were deficient. Quoting *Zinermon,* we stated, "[w]hether the postdeprivation remedies provide constitutionally adequate recourse will turn on 'whether predeprivation procedural safeguards could address the risk of deprivations of the kind ... allege[d],' ... or 'whether predeprivation safeguards would have any value in guarding against the kind of deprivation ... allegedly suffered.'" 956 F.2d at 558–59 (quoting 494 U.S. at 132 and 135, 110 S.Ct. at 986 and 988).

█ Both sides cite *Bigelow v. Michigan Dept. of Natural Resources,* 970 F.2d 154 (6th Cir.1992), in support of their positions. We believe this reliance is misplaced. *Bigelow* was a "taking" case in which the procedural due process claim was "ancillary to [the] main issue." *Id.* at 160. That is not the present case. The magistrate judge recommended that Harris' Fifth Amendment taking claim be dismissed and Harris did not file an objection to that recommendation. Failure to file an objection to a magistrate judge's recommendation constitutes a waiver

---

**1.** The Supreme Court overruled *Parratt* in *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), to the extent *Parratt* held

that negligent acts of state officials causing unintended deprivation of life, liberty or property constitute due process violations.

of the right to appeal on the basis of that recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981). The matter comes to us as a "pure due process case," not as one in which the due process claims are ancillary to any other claim.

## IV.

 We review an order granting summary judgment de novo. *Patton v. Beardon,* 8 F.3d 343, 346 (6th Cir.1993). Summary judgment may be granted only where there are no genuine issues of material fact and the moving parties are entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). The court considering a motion for summary judgment must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in the light most favorable to the party opposing the motion. *Id.; Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party may not rely on his pleadings alone, but must demonstrate the existence of a genuine issue for trial by pointing to "specific facts" that create such an issue. *Id.* at 586–87, 106 S.Ct. at 1356; *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The judge may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

## V.

### A.

 The district court erred in treating the plaintiff's procedural due process claim as one for deprivation of property by reason of a random or unauthorized act of a government official. From the beginning Harris stressed that the defendants acted pursuant to established procedures but either with intent to injure his property or with reckless disregard of the requirements for determining whether an emergency actually existed before deciding to demolish his building.

The district court relied upon dictum in *Macene v. M.J.W., Inc.,* 951 F.2d 700 (6th Cir. 1991), where we stated that a plaintiff can prevail in a § 1983 procedural due process claim in one of two ways:

> (1) by demonstrating that he is deprived of property as a result of established state procedure that itself violates due process rights; or (2) by proving that the defendants deprived him of property rights pursuant to a "random and unauthorized act" *and* that available state remedies would not adequately compensate for the loss.

*Id.* at 706 (emphasis in original). The present case involves the situation referred to in *Parratt,* where "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the property of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." 451 U.S. at 539, 101 S.Ct. at 1915 (footnote omitted).

Harris alleged that the defendants followed an established state procedure outlined in the city code, but in their haste to demolish his building, they found an emergency where none actually existed and, as a result, followed the wrong established procedure. In the absence of an emergency Harris claimed he was entitled to notice and an opportunity to be heard as provided in code § 190.702. The defendants responded that they acted pursuant to a code provision applying to emergencies, and that their efforts to give Harris notice before the demolition were unavailing.

### B.

 As in *Zinermon,* the plaintiff here does not challenge the constitutionality of the emergency procedure in code § 190.705. Rather, Harris charges that Hymes and Burgoon and other city officials acted improperly in deciding there was an emergency situation and then proceeding under code § 190.705, which dispensed with the notice requirement applicable to non-emergency situations under code under code § 190.702. This act was

"authorized" because the code delegated to Hymes and Burgoon the authority under which they proceeded, and thus permitted the very act that the plaintiff complains of— demolition of his property without prior notice.

Despite the similarities described above, however, we believe *Zinermon* is distinguishable. To the extent there was an emergency requiring the *Zinermon* plaintiff Burch to be hospitalized immediately, this could have been accomplished under *either* the voluntary or the involuntary admission procedure. *Zinermon*, 494 U.S. at 136–37, 110 S.Ct. at 989. If the state officials had followed the involuntary procedure, Burch would have been admitted for observation and evaluation over a limited time and would have had an opportunity to contest the findings prior to an indefinite commitment. He would not have been subjected to the seven months of confinement that resulted from his allegedly wrongful admission under the voluntary procedure.

No such option was available to the Akron officials. If an emergency existed, the only available course of action for removing the threat to public health and safety was to carry out the demolition forthwith. Under these circumstances, there was no opportunity for notice and a predeprivation process. An erroneous determination that no emergency existed would have resulted in the very threat to the public that the code was intended to prevent. Thus, if there was an actual emergency, unlike in *Zinermon*, the authorities in this case could remove that emergency only by destroying the building. Following the non-emergency procedure of code § 190.702 would have left the emergency untreated and the public exposed to the resulting danger.

In addition, *Zinermon* involved a liberty interest, not just property. In *Parratt* the Court quoted from two earlier opinions the rule that "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate." 451 U.S. at 540, 101 S.Ct. at 1915 (quoting *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 611, 94 S.Ct.

1895, 1902, 40 L.Ed.2d 406 (1974), in turn quoting *Phillips v. Commissioner*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 611–12, 75 L.Ed. 1289 (1931) (interior quotation marks omitted)). The facts and holding of *Zinermon* simply do not fit this case.

### C.

Code § 190.705 leaves the determination of whether an emergency existed on July 17 completely within the judgment of the superintendent of building inspection. Harris has not attacked the constitutionality of code § 190.705 for lack of standards or otherwise. Thus, he accepts the authority of this official to make the determination, but questions the correctness of his judgment. Regardless of whether the official's conclusion as to the existence of an emergency was correct or not, the unchallenged code section placed him in a position where there was "necessity of quick action." *Parratt*, 451 U.S. at 539, 101 S.Ct. at 1915. Under these circumstances, it was impracticable to wait for a predeprivation process to run its course. The availability of a meaningful postdeprivation process "by which to assess the propriety of the [city's] action at some time after the initial taking" satisfied the requirements of procedural due process. *Id.* Our *Watts* decision is not to the contrary, as it recognizes the emergency exception, stating there was no showing that it was essential for the authorities to take quick action.

The Bergson affidavit demonstrated the existence of a genuine issue of fact, but we conclude that no genuine issue of *material* fact existed in this case. With the authority of the decision makers unchallenged, the question of whether an emergency actually existed constituted nothing more than a question of whether they made the right decision. By attempting to show only that the defendants made the wrong decision, Harris in no sense attacked the constitutionality of the process by which that decision was reached.

We conclude that the district court correctly granted summary judgment on the plaintiff's procedural due process claim. Although the court incorrectly analyzed the

issue under the "random and unauthorized act" *Parratt* exception, we believe judgment for the defendants was proper under the other *Parratt* rationale. The defendants were faced with a situation that required quick action. The non-emergency procedure for notifying the owner of a building would not have removed the threat to public safety and health perceived by the responsible officials. The state provided a meaningful post-deprivation process to determine the propriety of the demolition decision. Under these circumstances the requirements of procedural due process were satisfied.

## VI.

This court has recognized two types of substantive due process violations: (1) official acts that are unreasonable and arbitrary and "may not take place no matter what procedural protections accompany them," and (2) official conduct that "shocks the conscience." *Wilson v. Beebe,* 770 F.2d 578, 586 (6th Cir.1985) (en banc) (quoting *Hudson v. Palmer,* 468 U.S. at 541 n. 4, 104 S.Ct. at 3208 n. 4 (separate opinion of Stevens, J.)). Although Harris alleged in his complaint that the defendants acted arbitrarily and in bad faith, when faced with a motion for summary judgment he came forward with no proof of specific facts in support of that claim. Bergson's affidavit states that the defendants acted hastily and without resorting to available means of determining the true condition of the building. Harris offered no evidence in support of his claim that any of the officials acted arbitrarily and unreasonably, or in bad faith. At most the proffered evidence pointed to a faulty decision made in haste. The code gave these officials the authority to demolish a building found to be a threat to public safety or health and the plaintiff produced no proof that they abused that power.

So far as we know, or have been informed, no court has held that it shocks the conscience for municipal authorities, acting pursuant to an unchallenged ordinance, to order the destruction of a building found by responsible officers to be a nuisance or threat to public health or safety. Although perhaps the defendants could have made further inquiries concerning the condition of the build-ing, their deposition testimony makes clear that they acted on the basis of their observations and training. The district court properly granted summary judgment on the substantive due process claim.

## CONCLUSION

*Parratt* holds that government actors faced with the necessity to take quick action under circumstances where it is impracticable or impossible to provide predeprivation process do not violate an individual's due process rights by depriving him of property so long as there is in place a meaningful postdeprivation process. It is not necessary that the official conduct consist of random and unauthorized acts for *Parratt* to apply. The record in this case does not support the plaintiff's claim of either a procedural or substantive due process violation.

The plaintiff is not without a remedy, however. The district court, accepting the magistrate judge's recommendation, dismissed Harris' "taking" claim as premature; it did not decide that claim on the merits. The plaintiff may pursue his claim for damages in an inverse condemnation proceeding as recognized by the Ohio Supreme Court in *Solly v. City of Toledo,* 7 Ohio St.2d 16, 19–20, 36 O.O.2d 9, 218 N.E.2d 463 (1966). Only if that action fails to produce a remedy will the plaintiff have fulfilled the prerequisites for a Fifth Amendment claim based on a taking of his property without just compensation. *Williamson County Reg. Planning Comm. v. Hamilton Bank,* 473 U.S. 172, 185, 194–95, 105 S.Ct. 3108, 3115–16, 3120, 87 L.Ed.2d 126 (1985); *Bigelow v. Michigan Dept. of Natural Resources,* 970 F.2d 154, 157–58 (6th Cir.1992).

The judgment of the district court is affirmed.